IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

JOHN CRANE PRODUCTION §
SOLUTIONS, INC., §
  §
Plaintiff, §
  § Civil Action No. 3:11-CV-3237-D
VS. §
  §
R2R AND D, LLC, et al., §
  §
Defendants. §

MEMORANDUM OPINION
AND ORDER

Plaintiff John Crane Production Solutions, Inc. ("JCPS") moves to disqualify Matthews, Lawson & Johnson, PLLC (the "Matthews Firm"), counsel for defendants R2R and D, LLC ("R2R"), Finalrod, Inc. ("Finalrod"), and Russell P. Rutledge ("Rutledge"), based on the firm's prior representation of The Fiber Composite Company, Inc. d/b/a Fiberod, Inc. d/b/a Fiberod Industries, LLC d/b/a Fiberod Inc. d/b/a FC Patent, Ltd. ("Fiberod"). Finding that JCPS has established the two elements of the substantial relationship test, the court grants the motion.

I

Many of the background facts in this case are set out in prior memorandum opinions and orders filed in this case. *See, e.g., John Crane Prod. Solutions, Inc. v. R2R and D, LLC*, ___ F.Supp.2d ___, 2012 WL 951723, at *1 (N.D. Tex. Mar. 21, 2012) (Fitzwater, C.J.) ("*John Crane I*"). In a memorandum opinion and order related to the instant motion, the court directed the parties to submit supplemental briefs and evidence because the court

lacked sufficient evidence to determine whether the attorney-client privilege with the Matthews Firm held by Fiberod had passed to JCPS. *See John Crane Prod. Solutions, Inc. v. R2R and D, LLC*, 2012 WL 1694084, at *2 (N.D. Tex. May 15, 2012) (Fitzwater, C.J.). The court will therefore recount the facts and procedural history that are pertinent to the motion to disqualify and are supported by the record, as supplemented.

Plaintiff JCPS moves to disqualify the Matthews Firm on the ground that it previously represented JCPS in a substantially related matter. The Matthews Firm has represented defendant Rutledge and his companies for nearly 25 years. Rutledge formed and served as Chairman and CEO of Fiberod, a manufacturer and seller of fiberglass sucker rods. In 2002 Fiberod created the brand name FIBEROD for its fiberglass sucker rods and began marketing them under that name. The Matthews Firm represented Fiberod on intellectual property matters, including prosecuting and registering the FIBEROD mark and other trademarks with the U.S. Patent and Trademark Office ("PTO").[1] In 2008 JCPS, through its predecessors-in-interest, entered into an asset purchase agreement ("APA")[2] with Fiberod to acquire almost all of the assets, property, and rights of Fiberod, including Fiberod's interest in the

---

[1]The FIBEROD name and logo were registered with the PTO in 2005 and 2007, respectively.

[2]The sellers in the APA were Fiberod, FC Patent, Ltd., Fiberod Industries, LLC, Fiberod, Inc., Rutledge, and John Erazim. The buyers in the APA were FR Acquisition Sub., Inc. and its parent company, Upsteam Energy Services, Inc. FR Acquisition Sub., Inc. later change its named to Fiberod, Inc. and merged into CDI Energy Services, Inc., who later changed its name to JCPS. For clarity, the court will refer to the sellers in the APA as "Fiberod" and to the buyers as "JCPS."

FIBEROD name and trademark.  Subsequent to entering into the APA, JCPS hired the Matthews Firm to perform various legal services, including on intellectual property matters.

In 2011 Rutledge created two new companies—defendants R2R and Finalrod—to manufacture and sell a new type of fiberglass sucker rod.  Defendants have applied for trademarks in "FINALROD" and the phrase "The FinalRod You Will Ever Need."[3]  JCPS filed this trademark infringement action alleging that defendants' junior mark "FINALROD" is confusingly similar to JCPS's senior mark "FIBEROD," and that this confusion threatens to cause irreparable harm to JCPS's trademarks and fiberglass sucker rod business.  In *John Crane I* the court denied JCPS's application for a preliminary injunction enjoining defendants' use of the FINALROD mark.  *John Crane I*, 2012 WL 951723, at *1.

## II

The Fifth Circuit is "sensitive to preventing conflicts of interest."  *In re ProEduc. Int'l, Inc.*, 587 F.3d 296, 299 (5th Cir. 2009) (quoting *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992)) (internal quotation marks omitted).  District courts are therefore "obliged to take measures against unethical conduct occurring in connection with any proceeding before it."  *Woods v. Covington Cnty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976) (collecting cases).  But "[b]ecause of the severity of disqualification, we do not apply disqualification

---

[3]Defendants applied to the PTO for trademark protection for the marks FINALROD and "The FinalRod You Will Ever Need."  After the PTO determined that there was no likelihood of confusion concerning the FINALROD mark, JCPS filed an opposition in the PTO and initiated this lawsuit.  After defendant R2R answered the complaint, JCPS suspended its opposition in the PTO.

rules 'mechanically,' but we consider '[a]ll of the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.'" *ProEduc.*, 587 F.3d at 300 (alterations in original) (quoting *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995)).

"Motions to disqualify are substantive motions[;] [t]herefore, they are decided under federal law." *U.S. Fire Ins.*, 50 F.3d at 1312. The Model Rules adopted by the American Bar Association ("ABA"), the local rules adopted by the district court, and the ethics rules of the state are all relevant to a motion to disqualify, but none is dispositive. *Id.*; *see also ProEduc.*, 587 F.3d at 299 (considering ABA Model Rules, local rules, and Texas rules); *In re Dresser Indus., Inc.*, 972 F.2d 540, 543-44 (5th Cir. 1992) (holding that ABA rules are "useful guides," but not controlling). Attorneys practicing in this court are subject to the Texas Disciplinary Rules of Professional Conduct. *See* N.D. Tex. Civ. R. 83.8(e) (addressing civil cases). Texas Rule 1.09 provides:

> (a) Without prior consent, a lawyer who personally has formerly represented a client in a matter shall not thereafter represent another person in a matter adverse to the former client:
>> (1) in which such other person questions the validity of the lawyer's services or work product for the former client;
>> (2) if the representation in reasonable probability will involve a violation of Rule 1.05 [regarding disclosure of confidential information]; or
>> (3) if it is the same or a substantially related matter.

Tex. Disciplinary R. Prof'l Conduct 1.09(a), *reprinted in* Tex. Gov't Code Ann., tit. 2, subtit. G, app. A, Art. 10, § 9 (West 2005). "ABA Rule 1.9 is identical to Texas Rule 1.09 in all

- 4 -

important respects[.]" *Am. Airlines*, 972 F.2d at 615 n.2 (focusing discussion on Texas rules due to their similarity to ABA Model Rules).

In cases involving an alleged conflict of interest due to one party's attorney's prior representation of the other party, the Fifth Circuit applies a substantial relationship test: "[a] party seeking to disqualify opposing counsel on the ground of a former representation must establish two elements: 1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations." *Id.* at 614 (collecting cases). The party seeking disqualification bears the burden of proof. *Id.* (citing *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1032 (5th Cir. Unit B June 1981), *abrogated in part on other grounds by Gibbs v. Paluk*, 742 F.2d 181 (5th Cir. 1984)). "A substantial relationship exists when the prior representation concerns 'the particular practices and procedures which are the subject matter of [the] suit.'" *Id.* at 625 (quoting *Duncan*, 646 F.2d at 1032). "[A] substantial relationship may be found only after the moving party delineates with specificity the subject matters, issues and causes of action common to prior and current representations and the court engages in a painstaking analysis of the facts and precise application of precedent." *Id.* at 614 (internal quotation marks and citations omitted). The moving party "need not prove that the past and present matters are so similar that a lawyer's continued involvement threatens to taint the trial." *Id.* at 616; *see also Duncan*, 646 F.2d at 1028 ("[The moving party] need only to show that the matters embraced within the pending suit are substantially related to the matters or cause of action wherein the attorney previously

represented him."). Nor does the subject matter need to be "'relevant' in the evidentiary sense to be 'substantially related[;]' [instead,] [i]t need only be akin to the present action in a way reasonable persons would understand as important to the issues involved." *In re Corrugated Container Antitrust Litig.*, 659 F.2d 1341, 1346 (5th Cir. Unit A Oct. 1981), *abrogated in part on other grounds by Gibbs*, 742 F.2d 181.

"Once it is established that the prior matters are substantially related to the present case, 'the court will irrebuttably presume that relevant confidential information was disclosed during the former period of representation.'" *Am. Airlines*, 972 F.2d at 614 (quoting *Duncan*, 646 F.2d at 1028; *Corrugated Container*, 659 F.2d at 1347). This is true even in cases where there is no chance that confidential information might be used against the former client, since "[a] client would feel wronged if an opponent prevailed against him with the aid of an attorney who formerly represented the clients in the same matter." *Id.* at 618 (quoting *Brennan's, Inc. v. Brennan's Rests., Inc.*, 590 F.2d 168, 172 (5th Cir. 1979)).[4] "[A] lawyer's obligation of confidentiality must be seen as part of the lawyer's primary duty of loyalty, a duty that is not exhausted by the preservation of a former client's secrets." *Id.* at 619. Attorneys are barred "from appearing in substantially related matters not only to protect individual parties against the adverse use of information but also to aid the frank exchange

---

[4]This is also true even if the information relied on in the prior representation is all publically available information, because the information provided by a client to his attorney "is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship . . . regard[less] whether someone else may be privy to it." *Brennan's*, 590 F.2d at 172 (citing *NCK Org. Ltd. v. Bregman*, 542 F.2d 128, 133 (2d Cir. 1976)).

between attorney and client." *Id.* at 619-20 (citations and internal quotation marks omitted). "[B]ecause the substantial relationship test is concerned with both a lawyer's duty of confidentiality *and* his duty of loyalty, a lawyer who has given advice in a substantially related matter must be disqualified, whether or not he has gained confidences." *Id.* at 619 (emphasis in original); *see also Brennan's*, 590 F.2d at 171-72.  "[T]he provision of legal advice on a substantially related matter by itself requires disqualification." *Am. Airlines*, 972 F.2d at 619.

III

The court turns to the first prong of the substantial relationship test and considers whether JCPS has proved that there was an attorney-client relationship between JCPS and the Matthews Firm.

A

JCPS argues, and defendants do not dispute, that the Matthews Firm represented JCPS on intellectual property matters *after* the APA; therefore, to the extent JCPS relies on the Matthews Firm's representation of it in such matters, JCPS has established prong one of the substantial relationship test.

JCPS also relies on legal work that the Matthews Firm performed on Fiberod's behalf *before* the APA.  Defendants contend that the court cannot take this legal work into account when assessing whether there is a substantial relationship because the Matthews Firm did not perform the work on behalf of JCPS.  JCPS responds that, because the APA transferred control of Fiberod and effected the continuation of the business under new management, the

attorney-client privilege held by Fiberod passed to JCPS, and JCPS can therefore rely on legal services that the Matthews Firm performed for Fiberod as if the Matthews Firm had performed the work for JCPS.

B

In *Commodity Futures Trading Commission v. Weintraub*, 471 U.S. 343 (1985), the Supreme Court stated that "when control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well." *Id.* at 349. "New managers installed as a result of a takeover, merger, loss of confidence by shareholders, or simply normal succession" control the attorney-client privilege previously controlled by old management. *Id.* Most courts interpreting *Weintraub* agree "that assignees or transferees of most, if not all, of a corporation's assets will have the authority to assert or waive the attorney-client privilege," but "[a] transfer of assets, without more, is not sufficient to effect a transfer of the privileges; control of the entity possessing the privileges must also pass for the privileges to pass." *Am. Int'l Specialty Lines Ins. Co. v. NWI–I, Inc.*, 240 F.R.D. 401, 406 (N.D. Ill. 2007) (alteration in original; internal quotation marks omitted) (collecting cases). Some courts have concluded that a bright-line rule cannot capture "the myriad ways control of a corporation or a portion of corporation can change hands." *Soverain Software LLC v. Gap, Inc.*, 340 F.Supp.2d 760, 763 (E.D. Tex. 2004). So when determining whether the attorney-client privilege has transferred, courts should examine whether "the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management," and if they do, "the attorney-client

privilege will follow as well." *Id.*; *see also Parus Holdings, Inc. v. Banner & Witcoff, Ltd.*, 585 F.Supp.2d 995, 1002 (N.D. Ill. 2008) (holding that rule from *Soverain* is "the better reasoned rule, and the one that appears to be followed by the majority of recent cases"); *NWI–I*, 240 F.R.D. at 407 ("[B]ecause the practical consequences of the Asset Purchase Agreement resulted in the transfer of control of Old FTL's business and the continuation of that business under new management, the authority to assert or waive the attorney-client privilege transferred to New FTL."). In determining whether the "practical consequences" of a given transaction result in the "transfer of control," courts consider such factors as the extent of the assets acquired, including whether stock was sold, whether the purchasing entity continues to sell the same product or service, whether the old customers and employees are retained, and whether the same patents and trademarks are used. *See, e.g., M–I, LLC v. Stelly*, 2010 WL 2196281, at *4-5 (S.D. Tex. May 26, 2010); *Soverain Software*, 340 F.Supp.2d at 763–64.

## C

JCPS has proved that the practical consequences of the Fiberod-JCPS APA resulted in "the transfer of control of the [Fiberod] business and the continuation of the business under new management." *Soverain Software*, 340 F.Supp.2d at 763.[5] The APA provided that JCPS

---

[5]Defendants argue that JCPS is judicially estopped from asserting that the APA was anything more than an asset transaction based on various representations made by JCPS and its agents during a now-settled state court legal fee dispute between JCPS and the Matthews Firm. Defendants rely on evidence that, as part of the state court litigation, JCPS characterized the APA as merely an asset purchase and argued that JCPS was not required to pay for legal services that the Matthews Firm provided Fiberod because Fiberod was a

obtained most of Fiberod's assets, including all of the assets crucial to running Fiberod's business. These assets included "all machinery, equipment, Inventory, work-in-process, office furniture, fixtures, automobiles, leasehold improvements, computers . . .; all information . . ., including without limitation customer and supplier lists; . . . all Company [intellectual property], including the name 'Fiberod'[;] all rights under any permits[;] all Owned Real Property"; and "the business and operations of [Fiberod] as a going concern." P. Supp. App. 11-12. According to the APA and defendants, the only assets that were excluded were Fiberod's cash and cash equivalents, corporate documents, bank accounts, records, and $3 million in assets (which included goodwill and various tangible assets).

The APA and JCPS's actions immediately following the APA demonstrate that the practical consequences of the transaction were that JCPS continued to run Fiberod's business under new management. First, the APA specifically stated that JCPS received the "business and operations of [Fiberod] *as a going concern.*" *Id.* at 12 (emphasis added). Second, the APA imposed certain obligations on Fiberod that demonstrate JCPS's intent to continue operating Fiberod's business, such as Fiberod's obligation to maintain the status quo of its assets, relationships, and employment, and Fiberod's obligation to obtain consent from the

---

"another company." D. Supp. Resp. 14.

> Most courts have identified at least two limitations on the application of the doctrine [of judicial estoppel]: (1) it may be applied only where the position of the party to be estopped is clearly inconsistent with its previous one; and (2) that party must have convinced the court to accept that previous position.

*Ahrens v. Perot Sys. Corp.*, 205 F.3d 831, 833 (5th Cir. 2000). At a minimum, defendants have not shown that JCPS convinced the state court to accept its position.

Texas Commission on Environmental Quality for JCPS to operate Fiberod's Big Spring, Texas facility "in a manner consistent with current operations." *Id.* at 44-45. Third, the APA allowed JCPS to designate which Fiberod employees' employment would be transferred to JCPS, and 98% of Fiberod's employees transferred to JCPS, including defendant Rutledge, who became the President of JCPS,[6] and nine other members of Fiberod's management.[7] Fourth, the APA gave JCPS rights in Fiberod's properties and leaseholds at which Fiberod had previously conducted business, and JCPS continued to operate the business at these locations. Fifth, JCPS continued to sell the same products as Fiberod. Sixth, the APA provided JCPS with Fiberod's customer and supplier data, and, following the APA, JCPS continued to utilize several of the same suppliers and sell products to many of the same customers.

Two facts weigh against finding that the attorney-client privilege passed from Fiberod to JCPS: JCPS did not acquire any of Fiberod's stock, and it acquired very few of Fiberod's

---

[6]Defendants point out that, after the APA, Rutledge was required by contract with JCPS to report to the President of John Crane, Inc., and they posit that there was no guarantee that JCPS would continue to sell the products that Fiberod sold or to use the intellectual property that Fiberod used. The court can, of course, consider arguments like these when analyzing the practical consequences of the transaction. But defendants do not present evidence, or even argue, that any such changes occurred in conjunction with, or shortly after, the parties entered into the APA. Without such evidence, the possibility that such changes *could* occur does not affect the court's analysis.

[7]Defendants argue that, although the employees were referred to in the APA as "transferred employees," in reality their employment with Fiberod was terminated, and a new employment contract was created with JCPS. This does not, however, change the fact that the "practical consequences" of the transaction allowed an overwhelming majority of Fiberod's employees to continue their employment with JCPS.

liabilities.  The court finds, however, that a preponderance of the evidence demonstrates that

the practical consequences of the APA were that control of Fiberod passed to JCPS, which

continued[8] the business under new management, and therefore "the attorney-client privilege

. . . follow[ed] as well."[9]  *Soverain Software*, 340 F.Supp.2d at 763.  Other than Fiberod's

---

[8]Defendants contend that JCPS cannot argue that it "continued" any relationship or practice that began before JCPS became a legal entity on May 2, 2008.  But the dispositive question is whether the attorney-client privilege between the Matthews Firm and Fiberod—a privilege held by Fiberod—passed to JCPS after JCPS was created.  It does not matter that JCPS could not have had an attorney-client relationship with the Matthews Firm before JCPS became a legal entity, provided that the Matthews Firm and Fiberod had one and that the attorney-client privilege held by Fiberod passed to JCPS.

[9]Defendants argue that *Weintraub* and the cases relying on it do not stand for the proposition that a transaction between two corporations can function to transfer the attorney-client privilege from the original corporation to the new corporation when the original corporation remains in existence.  Instead, defendants argue, by relying on the list of transactions set forth in *Weintraub* and other cases, that the attorney-client privilege can only pass to the new management of the *same* corporation through a merger, bankruptcy, or similar transaction.  The court disagrees, because such a rule does not take into account "the myriad ways control of a corporation can change hands."  *Soverain Software*, 340 F.Supp.2d at 763.  Moreover, even in the case of a bankruptcy, which defendants do not dispute is a context in which the attorney-client privilege can pass, the bankrupt entity may still exist, even though its attorney-client privilege has passed to the reorganized debtor.  *See, e.g., NWI–I, Inc.*, 240 F.R.D. at 406 (collecting cases) ("[A]fter *Weintraub*, several courts have recognized that assignees or transferees of most, if not all, of a corporation's assets will have the authority to assert or waive the attorney-client privilege."); *Ramada Franchise Sys. v. Hotel of Gainesville Assocs.*, 988 F.Supp. 1460, 1463 (N.D. Ga. 1997) (holding that, following a bankruptcy, the new corporation could assert the old corporation's attorney-client privilege even though the old corporation was still legally in existence); *Parus Holdings*, 585 F.Supp.2d at 1002 (citing cases) ("Cases also hold that a transfer of the relationship can occur in situations involving the sale of less than all the organization's assets.").

Defendants' argument that the attorney-client relationship cannot pass without consent of the attorneys is also misplaced.  The principle set forth in *Weintraub* and its progeny focuses on the control of the corporation and the practical consequences of the transaction to determine if the attorney-client privilege passes without regard to whether the attorneys or either party consented to the passing of the privilege.

stock, JCPS acquired nearly all of Fiberod's assets, including the assets that were necessary to continue running Fiberod's business.  JCPS continued selling the same products, hired almost all of Fiberod's employees, including many management personnel, utilized the same facilities, and acquired and used Fiberod's intellectual property.  The practical consequences of the APA were to continue the Fiberod business under JCPS management. *See Stelly*, 2010 WL 2196281, at *4 (holding that an acquisition transferred the attorney-client privilege and finding it significant that the purchasers "retained many of the employees . . . utilized [the] business contacts, support staff, technology, [and] methods of doing business") (alteration in original); *NWI–I*, 240 F.R.D. at 407 ("New FTL purchased substantially all of Old FTL's business operations and continues to operate Old FTL's business. Therefore, because the practical consequences of the Asset Purchase Agreement resulted in the transfer of control of Old FTL's business and the continuation of that business under new management, the authority to assert or waive the attorney-client privilege transferred to New FTL.") (citing *Soverain Software*, 340 F.Supp.2d at 763); *Soverain Software*, 340 F.Supp.2d at 763 (holding that attorney-client privilege passed because the purchasing entity "not only acquired certain assets but also continued [operating] the . . . business").  Because Fiberod's attorney-client privilege passed to JCPS, JCPS has established that an attorney-client relationship existed between JCPS and the Matthews Firm with regard to the legal work that the Matthews Firm performed on behalf of Fiberod relating to the business and assets obtained by JCPS as part of the APA.

IV

The court now turns to the second prong of the substantial relationship test and decides whether JCPS has proved "a substantial relationship between the subject matter of the former and present representations." *Am. Airlines*, 972 F.2d at 614.[10]

A

JCPS contends that the Matthews Firm must be disqualified because it represented JCPS on four occasions that JCPS alleges are substantially related to the subject matter of this lawsuit: (1) the Matthews Firm's prosecution of the FIBEROD trademarks at issue in this suit before the PTO on behalf of Fiberod; (2) the Matthews Firm's role as intellectual property counsel for Fiberod; (3) the Matthews Firm's role as counsel for Fiberod in selling the FIBEROD marks to JCPS as part of the APA;[11] and (4) the Matthews Firm's representation of JCPS as intellectual property counsel and, more specifically, the Matthews Firm's role in maintaining the FIBEROD marks with the PTO.[12]   According to JCPS, these past representations are substantially related to the subject matter of the Matthews Firm's

---

[10]The parties cite several Texas cases that define "substantially related" for purposes of the Texas Disciplinary Rules of Professional Conduct.  Although the court can consider these cases in determining the meaning of the Texas rules, the court in this case will apply the substantial relationship test as adopted and applied by the Fifth Circuit.

[11]Despite JCPS's argument to the contrary, the court cannot rely on defendants' alleged breaches of the APA as a basis for disqualification because JCPS does not make any claims in the instant suit based on the APA; instead, JCPS only asserts claims for trademark infringement and unfair competition.

[12]Despite defendants' arguments to the contrary, the court has already determined *supra* at § III(C) that the Matthews Firm's representation of Fiberod prior to the APA is considered a representation of JCPS for the purposes of the substantial relationship test.

representation of defendants in the instant case because this suit concerns the FIBEROD marks, and several past representations of JCPS by the Matthews Firm also involved the FIBEROD marks, including: the Matthews Firm's prosecuting and registering the FIBEROD marks before the PTO; the Matthews Firm's directing their due diligence efforts toward the FIBEROD marks in preparing for the APA; and the Matthews Firm's acting as the attorney of record with the PTO for the FIBEROD marks for over one year after the APA. JCPS's most specific argument is that the subject matter at issue in the Matthews Firm's prosecution and registration of the FIBEROD marks with the PTO, which includes that FIBEROD is a suggestive mark and therefore capable of being registered, is substantially related to the likelihood of confusion analysis required in the instant case.[13]

Defendants respond that the subject matter of the instant case is whether there is a likelihood of confusion between the FIBEROD and FINALROD marks, which is not related to the prosecution and registration of the FIBEROD mark before the PTO. Moreover, defendants assert that a substantial relationship does not exist merely because the former and current representations both involve intellectual property law or the FIBEROD mark, as JCPS maintains, because the law requires that the particular practices and procedures that are

_____

[13]The court need not address whether the Matthews Firm must be disqualified under ABA Model Rule 1.9(a) or Texas Disciplinary Rule of Professional Conduct 1.09, which prohibit a lawyer who has previously represented a party from representing a different party in the same or a substantially related matter when that party's interests are materially adverse to the interests of the former client, because if the matters are substantially related, the Matthews Firm must be disqualified regardless of whether defendants' interests are materially adverse to JCPS's interests.

the subject matter of this suit be substantially related to the subject matter of the earlier representation.[14]

B

The court finds that there is a substantial relationship between the subject matter of the Matthews Firm's prosecution and registration of the FIBEROD mark before the PTO and the issues involved in the present suit.   The Matthews Firm originally registered the FIBEROD mark with the PTO.   After the mark lapsed, the Matthews Firm sought to reregister the mark with the PTO.   The PTO initially denied the request because the examining attorney found FIBEROD to be merely descriptive.   The Matthews Firm argued that, based on the spectrum of marks—generic, descriptive, suggestive, or arbitrary, "generic marks being generally unregisterable . . . with arbitrary marks being generally registerable"—FIBEROD was a suggestive mark.   P. App. 356.   This is the case, the Matthews Firm argued, because "fiber" is not descriptive of "fiberglass" and "rod" does not connote "sucker rod."   *Id.* at 356-57.

Although defendants characterize the primary issue in this case as whether there is a

---

[14]The parties ask the court to consider various arguments in deciding the instant motion that are unrelated to the substantial relationship test, such as several policy considerations and the length of the attorney-client relationship between Rutledge and the Matthews Firm.   The court declines to consider these factors in assessing whether the Matthews Firm must be disqualified.   Although the substantial relationship test should not be applied in a "mechanical way," it "is categorical in requiring disqualification upon the establishment of a substantial relationship."   *Am. Airlines*, 972 F.2d at 614.   This is the case, at least in part, because "a single inquiry into whether past and present representations are substantially related provides the best means to protect [client's interests in confidentiality and loyalty]."   *Id.* at 619.

- 16 -

likelihood of confusion between the FIBEROD and FINALROD marks, one of the eight digits of confusion this court must analyze to determine whether a likelihood of confusion exists is "the strength of [JCPS's] trademark," *John Crane I*, 2012 WL 951723, at *2 (citing *American Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008)), because "[s]tronger marks are entitled to greater protection," *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*, 576 F.3d 221, 227 (5th Cir. 2009); *see also Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188, 201 (5th Cir. 1998) ("The stronger the mark, the greater the protection it receives because the greater the likelihood that consumers will confuse the junior user's use with that of the senior user."). "Marks are normally assigned to 'categories of generally increasing distinctiveness': (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." *Xtreme Lashes*, 576 F.3d at 227 (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)). The three latter categories of marks are entitled to protection, while generic marks receive no protection, and descriptive marks "merit protection only if they have secondary meaning." *Id.* (citing *Two Pesos*, 505 U.S. at 769). Moreover, a court gives more weight to distinctive portions of a mark and less weight to generic portions. *Id.*

Based on the trademark infringement law of this circuit, it will be necessary for the court to assess the strength of the FIBEROD mark in deciding JCPS's trademark infringement claim. Because the Matthews Firm argued to the PTO that FIBEROD is not descriptive but is instead suggestive, and it will be necessary for the court to make a similar determination in this case, the existence of a substantial relationship between these two representations is "self-evident." *Corrugated Container*, 659 F.2d at 1346 ("The existence

of a 'substantial relationship' between Container's interrogatories about Kraft's purchasing practices and Chadwell's representation of Kraft which included the subject matter of purchasing practices is self-evident . . . .  Where parts of the present action and the past representation concern the very same subject matter, reasonable minds must agree they are substantially related.").  The strength of the FIBEROD mark was at issue in the Matthews Firm's past representation of JCPS and is at issue in this lawsuit.

Defendants maintain the Matthews Firm's legal work before the PTO on the FIBEROD mark could not be substantially related to this case because the FINALROD mark was not in existence at the time, and therefore prosecuting and registering FIBEROD could not in any way relate to FINALROD or whether there is a likelihood of confusion between FIBEROD and FINALROD.  More specifically, defendants posit that any assessment of the eight factors considered in trademark infringement claims will demonstrate that every factor, as between FINALROD and FIBEROD, occurred after the date of the Matthews Firm's work before the PTO, because FINALROD did not exist at the time.  The court disagrees.  Part of the likelihood of confusion analysis is the strength of the mark.  This factor is not considered in relation to the junior mark, and, even if it were, it would not prevent the court from concluding that an assessment of the relative strength of the mark is substantially related to an assessment of the strength of the mark, because the relatedness between these subject matters would also be self-evident.[15]

_____

[15]Defendants rely on *Stelly* and *Telectronics Proprietary, Ltd. v. Medtronic, Inc.*, 836 F.2d 1332, 1333 (Fed. Cir. 1988), for the proposition that, even if an attorney-client

Defendants also assert that, in the instant case, they have not and will not contest the strength of the FIBEROD mark as filed, but instead will only contest the strength of the individual elements of the mark.  More specifically, defendants assert that they only intend to argue that the distinct elements of the two marks at issue—"FIBER," "FINAL," and "ROD"—when considered alone, are merely descriptive in nature.[16]  In assessing the strength of the FIBEROD mark, however, the court can consider the distinct portions of the mark, giving more weight to distinctive portions and less weight to generic portions.  *See Xtreme Lashes*, 576 F.3d at 227.  Furthermore, even if defendants' arguments in this suit will not be precisely the same as those made before the PTO, defendants' assertion that they will not

relationship existed between JCPS and the Matthews Firm when the Matthews Firm registered the FIBEROD mark with the PTO, acts taken after the initial representation ended that are at issue in the instant case, such as the creation of FINALROD, cannot serve as the basis for disqualification.  But as the court explains, the strength of the FIBEROD mark itself is at issue in the instant case.  In other words, defendants are attempting to frame the issues in the present case as concerning FINALROD and whether it creates a likelihood of confusion.  But to make this determination, the court must also analyze the FIBEROD mark, including its strength.  Moreover, the courts in *Stelly* and *Telectronics* did not hold, as defendants contend, that acts taken subsequent to the former representation could not act to disqualify counsel.  The court in *Stelly* was merely noting that counsel was not involved in executing the contracts at issue in the case before the court.  *See Stelly*, 2010 WL 2196281, at *6 ("[T]he specific employment contracts at issue here—non-competes and confidentiality agreements—were executed between M–I and Stelly and Squyres individually, after the acquisition.").  Defendants rely on quotations from *Telectronics* where the court was not applying the substantial relationship test because, when it applied a version of the substantial relationship test, it found at prong one that there was no former attorney-client relationship that could serve to disqualify the counsel at issue.  *See Telectronics*, 836 F.2d at 1336, 1338.  Defendants' reliance on these cases in support of their position in this case is therefore misplaced.

[16]The court notes, before the PTO,  the Matthews Firm asserted arguments regarding the distinctive elements of "fiber" and "rod."

- 19 -

contest the strength of the FIBEROD mark as filed does not preclude the court from finding that the representations are substantially related. The Fifth Circuit addressed a similar argument in *American Airlines*, where the nonmoving party argued that res judicata barred it from addressing certain issues that were substantially related to issues its lawyers had addressed on behalf of the moving party in a prior case, making it impossible for the subject matter of the two actions to be substantially related. *See Am. Airlines*, 972 F.2d at 624. The panel rejected this argument, noting that the exact scope of the issues at an early stage of the litigation, which is often when courts must consider motions to disqualify, is unclear. *Id.* To hold otherwise would lead parties to attempt to define the sphere of issues broadly or narrowly at an early stage in the litigation, as defendants are attempting to do in this case. The court therefore finds that, even if defendants do not contest the strength of the mark, the court is not precluded from finding that these matters are substantially related to the Matthews Firm's representation of Fiberod before the PTO.

The court is not holding that the Matthews Firm's representation of JCPS as intellectual property counsel after the APA,[17] including by remaining as the counsel of record with the PTO for the FIBEROD trademark, is substantially related to the subject matter of

---

[17]Defendants assert that, when the Matthews Firm was representing JCPS, it was only continuing its decades long practice of representing Rutledge and his companies, one of which was JCPS. But this is immaterial to the court's analysis because the Matthews Firm was representing JCPS, not Rutledge individually. And even if the representation of JCPS is considered to be the joint representation of JCPS and Rutledge, this is also immaterial. *See Brennan's*, 590 F.2d at 172 ("The need to safeguard the attorney-client relationship is not diminished by the fact that the prior representation was joint with the attorney's present client.").

the suit.[18]  The undisputed evidence demonstrates that the Matthews Firm did not do any

substantive legal work while serving as counsel of record for the FIBEROD mark after the

APA, and the fact that the representations involved the same area of law (intellectual

property), or even of the same FIBEROD trademark, is insufficient to meet the substantial

relationship test.[19]  *See Am. Airlines*, 972 F.2d at 625 ("A substantial relationship exists when

the prior representation concerns 'the particular practices and procedures which are the

subject matter of [the] suit.'") (quoting *Duncan*, 646 F.2d at 1032).  Moreover, merely

showing at a general level that the Matthews Firm worked on various intellectual property

matters for JCPS after the APA does not enable the court to conduct the "painstaking analysis

of the facts and precise application of precedent" to determine that the matters are

---

[18]The parties dispute whether the Matthews Firm was privy to JCPS's confidential information, and, if so, whether this fact should bear on the court's analysis.  The court need not specifically address this issue, however, because the substantial relationship test is the means by which the Fifth Circuit enforces a lawyer's duty of confidentiality.  *See Am. Airlines*, 972 F.2d at 619 ("We believe that a single inquiry into whether past and present representations are substantially related provides the best means to protect [the preservation of former client's secrets and the attorney's duty of loyalty.]").

The parties also dispute whether the court should consider the fact that any confidential information known by the Matthews Firm is also known by Rutledge or is otherwise publically available.  Whether information is publically available does not bear on the court's analysis.  *See id.* at 620 ("This court has held that '[i]nformation [provided by a client] is sheltered from use by the attorney against his client by virtue of the existence of the attorney-client relationship. This is true without regard to whether someone else may be privy to it.'") (alterations in original) (quoting *Brennan's*, 590 F.2d at 172).

[19]For similar reasons, the court cannot find a substantial relationship on the basis that the Matthews Firm directed its due diligence efforts toward the FIBEROD mark in preparing for the APA, because JCPS fails to detail how the particular legal issues involved in the Matthews Firm's due diligence work are substantially related to the issues and causes of actions in the instant case.

substantially related.  *See Brennan's*, 590 F.2d at 174; *see also Duncan*, 646 F.2d at 1029

("Merely stating that the previous representation involved securities work, conferences with

Merrill Lynch employees, and the preparation of various legal documents provides the

district court with no opportunity to engage in a 'painstaking analysis of the facts.'").

The court recognizes the "severity of disqualification," *ProEducation*, 587 F.3d at

300, but "[t]he test is categorical in requiring disqualification upon the establishment of a

substantial relationship between past and current representations," *American Airlines*, 972

F.2d at 614.  The court also acknowledges that an overbroad definition of "subject matter"

in the substantial relationship test could significantly limit the number of clients a law firm

can represent in a particular area of law, but JCPS has shown that the subject matter of the

Matthews Firm's former and current representations are substantially related.  Accordingly,

the court must disqualify the Matthews Firm from representing defendants in this case.

*   *   *

For the reasons explained, JCPS's January 4, 2012 motion to disqualify the Matthews

Firm is granted, and the Matthews Firm is disqualified from representing defendants in this

case.[20]

**SO ORDERED.**

August 14, 2012.

                                                                      _____
                                                                  SIDNEY A. FITZWATER
                                                                   CHIEF JUDGE

---

[20]On April 26, 2012 JCPS filed a motion for protective order quashing defendants' deposition notices and staying discovery, in which it seeks to stay discovery until the court has decided the motion to disqualify.  In view of today's decision, the motion is denied without prejudice as moot, and the discovery stay imposed by the court on April 30, 2012 is vacated.